Paul McDONOUGH and wife, Vivian McDonough, Plaintiffs–Appellants,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and State Farm Fire & Casualty Company, Defendants–Appellees.

Court of Appeals of Tennessee, Middle Section, at Nashville.

April 13, 1988.

Permission to Appeal Denied by Supreme Court July 18, 1988.

R. Steven Waldron, Murfressboro, for plaintiffs-appellants.

John R. Rucker, Jr., Rucker & Rucker, Murfreesboro, for defendants-appellees.

## OPINION

TODD, Presiding Judge.

On March 6, 1985, Richard McDonough, son of plaintiffs, was a guest passenger on a motorcycle operated by Michael D. Thomas, an uninsured motorist, when an accident occurred in which Richard McDonough lost his life. This action was brought by Richard McDonough's parents seeking a declaratory judgment that State Farm Mutual Automobile Insurance Company and/or State Farm Fire and Casualty Company is/are liable as uninsured motorist insurer(s) for damages which may be assessed against the uninsured host-operator.

From an adverse judgment, the plaintiffs have appealed and presented the following issues:

1. Whether the trial court committed reversible error by finding that the preponderance of the evidence was that Richard McDonough did not live with his parents at the time of his death?

2. Whether the trial court committed reversible error by finding that the preponderance of the evidence was that Richard McDonough was not an insured under the terms and conditions of the automobile liability insurance policies or personal liability umbrella policy issued by Defendants to Plaintiffs?

3. Whether the trial court committed reversible error by not holding that the Defendants should be estopped from denying coverage to Plaintiffs based upon their alleged defense that Richard McDonough was not living with his parents or was not a member of their household at the time of the accident which caused his death?

In effect on March 6, 1985, was a policy issued by State Farm Mutual on August 28, 1984, expiring on April 19, 1985. The "named insured" was designated "Paul McDonough". Uninsured Motor Vehicle coverage was designated, "Each Person $100,-000". The Uninsured Motor Vehicle Coverages section of the policy states coverage is afforded to 1. the named insured 2. the spouse of the named insured and 3. "their relatives". The Defined Words section of the policy states:

Relative—means a person related to you or your spouse by blood, marriage or adoption *who lives with you....* (emphasis supplied)

Also in effect on March 6, 1985, was a "Personal Liability Umbrella Policy" issued to Paul & Vivian McDonough by State Farm Fire and Casualty Company on August 28, 1984, and extending to August 28, 1985. The policy states:

We will pay, up to the Option U limit, the amount which you and your passengers are legally entitled to recover as damages from the owner or driver of an uninsured or underinsured automobile.

. . . .

5. Option U will apply in accordance with the terms and condition of your underlying Uninsured Motorist Coverage.

It is seen that the liability of State Farm Mutual is dependent upon the condition that the relative (Richard McDonough) "lives with you" (Paul McDonough); and that the liability of State Farm Fire is conditioned upon the injured party (Richard McDonough) being your (Paul or Vivian McDonough's) passenger or, possibly coverage extending to Richard McDonough under the "conditions of the underlying Uninsured Motorist coverage" (lives with you).

Thus, unless Richard McDonough lived with Paul McDonough on March 6, 1985,

there is no uninsured motorist coverage by either party.

■ By the verbiage of their first issue, quoted above, it appears that plaintiffs conceive that the burden was upon defendants to prove by a preponderance of the evidence that Richard McDonough *did not* live with his father, Paul McDonough. This Court does not agree with such a conception. It was and is the burden of plaintiffs to prove by a preponderance of the evidence that their son's injuries were insured by one or both of the defendants, and this includes proof that the conditions of insurance were in existence, including that deceased lived with the insured. *Farmers Bank and Trust Co. of Winchester v. Transamerica Ins. Co.*, 674 F.2d 548 (6th Cir.1982), cert. den. 459 U.S. 943, 103 S.Ct. 257, 74 L.Ed.2d 200; *Card v. Commercial Casualty Ins. Co.* 20 Tenn.App. 132, 95 S.W.2d 1281 (1936); 46 C.J.S. Insurance § 1321f p. 456.

The distinction may be academic, but the true issue is:

Whether the Trial Court erred in finding that plaintiffs had not shown by a preponderance of the evidence that Richard McDonough did live with Paul McDonough on March 6, 1985?

■ Mr. and Mrs. Paul McDonough moved from Pennsylvania to Murfreesboro, Tennessee in 1976. Richard McDonough remained in Pennsylvania where he was in college for eight months and then followed his parents to Murfreesboro. For about two years, he resided with his parents and attended Middle Tennessee State University. Thereafter, he attended the State Area Vocational School for about two years, during part of which 2 years he resided with his parents, and during part of which time he lived in a house on Leaf Avenue which he rented from the fall of 1981 until April, 1984. Thereafter, he resided with his parents six to eight months. On September 1, 1984, Richard McDonough leased for 1 year a house at 1714 Bartway which he occupied with a roommate who was expected to pay part of the rent. Richard McDonough continued the lease and use of the house to and including the date of his fatal injury.

The record has been closely scrutinized for evidence that, at the time of his injury, deceased was living with his parents. The testimony most favorable to the plaintiffs is that of the plaintiffs themselves.

Mr. Paul McDonough testified in pertinent part as follows:

"Q. You've heard testimony from Mr. Houston Carlton that Richard rented a house from him on Leaf Avenue for something in excess of two years. Do you know whether that is true or not?

"A. I'd say it's true, yes, sir.

"Q. And I think Mr. Carlton said that that period of time began in November or December of '81 and continued until April of '84. Is that about right?

"A. That's about right, sure.

"Q. And then did Richard then return home on a full-time basis at the conclusion of his use of the house at Leaf Avenue?

"A. Yes, he did.

"Q. And did he stay there with you at 2214 Moccasin Trail on a full-time basis until September 1, of '84?

"A. Yes, sir.

. . . .

"Q. How long did Richard stay with you at 2214 Moccasin Trail on a full-time basis?

"A. About six to eight months.

. . . .

"Q. Very well. Now, let's direct our attention to the time that Richard had some use of the house on Leaf Avenue owned by Mr. Carlton, okay?

"A. All right.

"Q. During that period of time, whatever it was, did Richard spend any nights in your home at 2214 Moccasin Trail?

"A. Well, the fact of the matter was I never recognized the fact that he moved out of the house. That's why I can't tell you the dates—if he had disappeared from the house I'm sure I would remember the dates but he never really moved. He was

with me. You know, he could be just at my house as much as he could be over there.

"Q. Well, did he spend nights in your home?

"A. Oh, yes. Any time he felt like it. I'd come in at night after work and find him there. He's stay there and sleep all night. He'd spend the whole weekend. Eat with us. I'd say roughly, you know, two or three nights a week he would be with us.

"Q. This is during the period of time that he had rights to the house on Leaf Avenue?

"A. This is true, yes.

"Q. Did he eat meals at your house during that period?

"A. Yes, he did. He ate meals with us. He helped himself to anything that was in the house.

. . . .

"Q. During that period of time did Richard have any property at your house?

"A. Oh, yes.

"Q. What type property did he have at your house?

"A. Oh, clothes, shoes. All of his work clothes essentially was at our house because Vivian did all the washing and ironing for him so there was two shifts, the dirty clothes he kept at his place, the clean clothes he'd come over to our place and pick up and take. He had some pieces of furniture, odds and ends. Books, some technical data that he kept at our house.

. . . .

"Q. So after his '81 Plymouth was damaged or destroyed on July 1, '84, did Richard have use of your pickup truck?

"A. Full-time use, yes.

. . . .

"Q. Where did the truck stay primarily?

"A. Most of the time the truck was over at Richard's place, right at the house where he was staying. And when he was with us it was over at our place.

"Q. Now, the lease agreement with Mr. Beaty shows that the lease for the Bartway property began September 1, '84. Is that about the time Richard began using that property?

"A. Yes, sir, that's true.

. . . .

"Q. Once Richard began using the 1714 Bartway property where was the truck?

"A. With him.

"Q. This is the 1980 Chevrolet pickup truck?

"A. The Chevrolet pickup truck was with him.

"Q. All right. And Richard continued to have access to that Bartway house until his death, did he not?

"A. Yes, he did.

"Q. And he had property from September 1 of '84 until the date of his death, did he not, in that house?

"A. He sure did, yes.

"Q. Did he also have property between September 1, '84 and the date of his death at your house?

"A. Oh, yes.

"Q. Tell me about that.

"A. Well, the property he had over there at our place, I think what we had was an old chair he didn't take with him. I think there was some sort of an end table he didn't think he'd need and old lamp he didn't want but, you know, it was his lamp and we never threw it out. We just kept it there. Plus some other books and technical stuff that he had at work that he just didn't carry with him. He just left them lie over here.

"Q. During that period of time that began September 1, '84 and ended on the date of Richard's death, March 12, '85, did he spend nights at your home?

"A. Of course. We had a—well, what we had was a bedroom there essentially for him, you know, for the boys and he just came and went as he pleased. He had a garage door opener and a key and whatever else.

"Q. A garage door opener. Did he have a key to your house?

"A. Oh, he had a key to the house and a garage door opener.

"Q. Did he ever come into the house when you and your wife weren't there?

"A. Oh yes, sure. He went in and he'd help himself to anything that he wanted in the house. In the freezer, we always kept it pretty well stocked, and if he wanted anything he'd take it.

"Q. On what basis did he spend time at your house beginning September 1, '84 and ending March 12, '85?

"A. Well, we're talking two—three days a week. Most all the time you could count on him on the weekends coming over to eat.

"Q. Did your wife continue to do his laundry?

"A. That was a constant thing. She always did his laundry and would take care of sewing the things that he tore up.

"Q. Did he get mail and correspondence at your house during this same period of time?

"A. Yes, various types of mail and correspondence.

"Q. Did he get some correspondence from State Farm during this period?

"A. Oh, yes. I think essentially all the correspondence from State Farm came to our house.

"Q. Now, he did get some correspondence at the other place, 1714 Bartway?

"A. Yes, he got correspondence at the other location also, I'm sure.

"Q. On Richard's permanent voter's registration information maintained here in the county, where did he show his permanent address to be?

"A. He showed it at our residence of 2214 Moccasin Trail.

"Q. And he last voted when?

"A. It was in November of '84, I believe.

. . . .

"Q. Did you have any discussions with Richard as to whether he would or would not return on a full-time basis to your home?

"A. . . . .

"So I asked him to come back on many different occasions, and we discussed it, you know, in quite a little bit of length when we were working together building different things. And he finally said, yeah, you know, after John had really said, no, I'm not going to move in, he was really serious about coming back with us, but he was worried about the lease and whether he could get out. And I said, well, the only way you can find out is ask and see if you can get out.

"Q. Do you know whether he did that or not?

"A. I don't know whether he finally talked to the owner of the house or not. I know he told me that he did want to come back, but we didn't set any firm date.

. . . .

"Q. . . . Describe the manner in which the house at 1714 Bartway was furnished after John Crouch moved himself and his furnishings out?

"A. There was a bed, a highboy, a kitchen table and chairs, television, hi-fi, and I think a couch. There was a couch.

"Q. Where there any rooms that were totally unfurnished?

"A. Oh, there was one bedroom that was totally unfurnished except for an old mattress that was thrown on the floor as a guest room, that's what I'll call it, because when Carol and Tom Flynn came into town they always stayed with Richard.

. . . .

"Q. At the time of the accident Richard was living on Bartway, was he not?

"A. Sure.

"Q. That's what you told Nathan Frost when he interviewed you shortly following the accident?

"A. I was interviewed by Nathan Frost and I described—well, I answered a lot of questions then and to be truthful, yes, he

was living there. As much there as with me.

. . . .

"Q. And you went over and removed Richard's property out of the house back to your house?

"A. Yes.

"Q. In moving that property did you move out the bed and couches and chairs that he had over there?

"A. Yes, we did.

"Q. And I believe he had an office desk and filing cabinet there?

"A. Yes.

. . . .

"Q. So this house on Bartway had three bedrooms, one in which Richard lived in and had his bedroom furniture?

"A. (Witness moves head up and down.)

"Q. The spare bedroom had a mattress on the floor that Mr. Flynn slept on when he came to visit?

"A. Uh-huh.

"Q. And then the third bedroom was maintained by Richard as his office?

"A. That's where his desk and chair were, yes.

"Q. And his filing cabinet?

"A. Okay.

"Q. What address did Richard list as his residence on his driver's license?

"A. Well, I gave you a copy of the driver's license and I think he showed Bartway.

. . . .

"Q. And does that driver's license—

"A. That driver's license says Bartway.

. . . .

"Q. I'd ask you, if you would, to look at what has been marked as Exhibit 29 and ask you if that is a notice from Murfreesboro Electric Department addressed to Richard McDonough asking him to pay a balance due?

"A. Yes, sir, that's what it says.

"Q. To what address was that mailed?

"A. That was sent to 1714 Bartway, Murfreesboro, Tennessee.

"Q. In the records you went though of Richard's following this accident I believe you located some information from his employer, Spartan Food Systems, Incorporated, did you not?

"A. I believe we did.

"Q. And that has been marked as Exhibit 30, a copy of a remittance of some kind from Spartan Foods to Richard McDonough?

"A. It says "remittance" but it is written to Richard at Bartway.

"Q. And the address shown on that is the Bartway address?

"A. It's the Bartway address.

. . . .

"Q. During the time that Richard lived on Leaf Avenue he had a telephone in his own name, did he not?

"A. Yes.

"Q. And he was listed in the telephone book as Richard McDonough, 1102 Leaf Avenue?

"A. Yes, sir.

"Q. He had a separate telephone line?

"A. Yes, sir.

. . . .

"Q. The third sheet in this Collective Exhibit is a bank statement dated what date?

"A. That's 9–12–84 and it's to Richard at 1714 Bartway.

"Q. Would you flip through the balance of that and tell us if in fact all of the other bank statements were mailed to Richard at 1714 Bartway beginning September 1984 and continuing through March 1985?

"A. Yes, that's true.

"Q. Now, I'd like you to look through what's been marked as Collective Exhibit Number 34 and ask you if those are not photocopies of various checks that Richard McDonough wrote beginning in August of 1984 and continuing through March of 1985? And while you are looking would

you please look at the addresses on those checks?

"A. The addresses on the first page are Leaf Avenue and Richard signed these and he signed—not Leaf but Bartway on these other ones signed by Richard. He has crossed out one and put Bartway. As a matter of fact, he crossed out everything and put Bartway.

"Q. After the first page of those checks he began marking out his Leaf Avenue address and listing Bartway as his address, did he not?

"A. That's true.

"Q. And does that carry through for the entire balance of those checks?

"A. Well, yes. A couple of these checks there was no address on so he just wrote it in.

"Q. What did he write in on those?

"A. He wrote Bartway.

"Q. Did any of those checks list his address as 2214 Moccasin Trail?

"A. Not these checks, no.

. . . .

"Q. Now, are you trying to tell this Court that he put a telephone in his own name, paid all the utilities, maintained that address on his driver's license, on his bank records, took his furniture over there, and he wasn't living there during that two-and-a-half year period?

"A. Now 100 percent of the time, no. I'm saying, yes, that's what I'm telling you because he came to me as much as he was over there. That's a fact. I'm not trying to, you know, pull your leg or anything else. I'm telling you what he lived, how he lived. How he was with us and how he had two separate places to go to. That was his choice. Why can't he have two places to live? And even after Timmy's death, you know, he was more closer to us than he had been before. He was with us all the time.

. . . .

"Q. At the time of the accident where was Richard living?

"A. At the time of the accident he was over on—let me get the streets straight for you—Bartway.

"Q. And he had been living there since September 1, 1984?

"A. That's right. And he had the same living arrangements there as what he had at Leaf. He was constantly coming back and forth between there and our house. As a matter of fact, you know, I never—I couldn't tell you the dates because the boy never moved out. He was with me as much as he was any place else.

. . . .

"Q. You are saying that he lived with you and you had a discussion with him about coming back home?

"A. I'm saying that when he had a residence at Bartway and at Leaf I said there's no reason for you to pay all these bills when you can come over here and move into your old room and stay with us.

"Q. If he was living with you on Moccasin Trail, why did you have any discussion with him about his coming back home with you?

"A. I wanted him to give up the house. That's essentially what the comments were about. There was no sense in keeping the house over there and staying over here part of the time. It don't make sense.

"Q. So what you are saying is you were just wanting him to give up the house?

"A. That's what I'm saying I guess, yes.

"Q. But he lived there, did he not?

"A. He lived there part of the time. He stayed over there as much as he stayed with me. I'm not saying that the kid didn't spend nights over there.

. . . .

"Q. Let me ask you, if you would, to look at your deposition that was taken, Page 18 at Line 10. Would you read the question and answer, please?

"A. 'At the time of the accident, where was Richard living'?

" 'He had a house on Bartway. That's when he had moved in with a buddy of his

who decided not to move in with him.' That was John.

"Q. Was that answer truthful at the time you gave it?

"A. He had a house on Bartway. That's what I'm saying. That's what I've said all along, he had a house on Bartway. I never denied that. What I'm saying is he's a member of my household and he always was. He was with me, I supported him. He spent as much time with me as he did anywhere else.

. . . .

"Q. From the time he moved to Rutherford County until the date of his death, did he live with you?

"A. Yes, he was in and out of my house just like he lived with me. I couldn't tell you when the boy moved out and when he moved in, and they keep asking me dates and I don't remember the dates.

. . . .

"Q. Well, was there ever a period of time after he moved to this county that he didn't live with you?

"A. No, sir, there was never a period of time."

Mrs. Vivian McDonough, mother of deceased testified in pertinent part as follows:

"Q. During the period of time that Richard had occupancy rights to the house on Leaf Avenue, on what sort of basis was Richard in and out of your home at 2214 Moccasin Trail?

"A. He was in and out all the time. I done his washing, his ironing. If I had left-over food I sent it home, over to his place.

"Q. Did he spend the night with you?

"A. Yes.

"Q. On any sort of regular basis?

"A. No.

"Q. How often on the average would he stay overnight with you per week?

"A. Two to three times and usually on weekends because we'd go to church on Sunday together. He'd stay Saturday night and we'd go to church on Sunday, and he stayed in the middle of the week also.

"Q. Was he ever in and out of your house during the time he had access rights to the Leaf Avenue house when he didn't spend the night?

"A. Oh, yes.

"Q. Did he have a key to the house?

"A. Yes.

"Q. Did he ever go in and out of the house when you and your husband weren't there?

"A. Yes.

"Q. Did he have any property at your house?

"A. Yes.

"Q. What type property items did he have at your home?

"A. His clothing. I don't know what all he had at the house, but he had a bed there to sleep in whenever he wanted to come over and stay or what have you.

"Q. Was there a room there that was set aside for Richard?

"A. Yes.

"Q. And is that where he stayed when he would come and stay with you during the time that he also stayed on Leaf Avenue.

"A. Yes.

. . . .

"Q. Now, let's direct our attention to the period beginning September 1, '84 and ending with Richard's death on March 12, 1985. On what type basis was Richard in your home during that period?

"A. The same as it was when he was on Leaf, back and forth, stay overnight. I done his laundry, and I cooked for him.

. . . .

"Q. Do you know whether or not Richard had any mail to come to your address, 2214 Moccasin Trail, after September 1, 1984?

"A. Yes, he did.

"Q. What type mail came to the house?

"A. Well, he had charges from Penney's and Visa and MasterCard and then there was insurance.

"Q. The documents that have been introduced into evidence this far?

"A. Yes.

"Q. Of course, he also got mail at Bartway, did he not?

"A. Yes, he did.

"Q. Had Richard any discussion with you about giving up the Bartway house?

"A. No. He just considered that as being home. He and my husband talked about that a lot.

"Q. He considered what as being home?

"A. 2214 Moccasin Trail."

It is obvious that the parents of deceased take the understandable view that an adult child may have two "homes", his parents' home in which he is always welcome and his own separate home which he has provided for himself. The parents consider that the son can "live" in both homes during the same period, and this is likewise understandable under the circumstances. However understandable, this view does not comport with the legal definition of the word "live" in reference to a place of residence.

The word "live" is commonly used as a synonym for the word "reside". *Curtis v. Curtis*, 330 Mich. 63, 46 N.W.2d 460 (1951).

It is synonymous with dwell, inhabit, sojourn, stay, rest. *MacLeod v. Stelle*, 43 Idaho 64, 249 P. 254 (1926).

The words, "live" and "reside" are synonymous and relate to the domicile or place where a person is deemed in law to reside. *Nelson v. Nelson*, 71 S.D. 342, 24 N.W.2d 327 (1946).

"Domicile" and "residence" are not synonymous in the law relating to situs for taxation: "domicile" imports a legal relation between a person and a place based upon actual residence plus a concurrent intention to remain there as a fixed abiding place. One may have but one domicile or legal residence, but he may have two or more residences, and he may not actually abide at his legal residence at all, but his actual residence must be his abiding place. *Denny v. Sumner County*, 134 Tenn. 468, 184 S.W. 14 (1915).

In *State Farm Mutual Automobile Insurance Company v. Thomas*, 699 S.W.2d 156 (Tenn.App.1983), the policy covered "any relative of the insured who is a resident of the same household". The insured had a 19 year old step-son who lived in the home of insured in Salem, Virginia and was dependent upon the insured and his wife during four months of the year from November to March. During the remainder of the year, from April to November, he lived in Gatlinburg, Tennessee, where he worked for the summer season in a restaurant. During his third season of employment, the stepson was involved in an accident while driving a vehicle of a third party. At the time he was occupying a residence in Gatlinburg with his brother and a girlfriend, sharing all expenses. The stepson testified that his permanent home was with his parents in Virginia and that he intended to return there at the end of his seasonal employment in November. His mailing address in Gatlinburg was "General Delivery". This Court summarized the determinative facts as follows:

> ... The proof shows Barry Thomas was a young man who lived with his parents and relied upon them for his support for a substantial part of the year. His parents provided him with an automobile for his use during his absence. His habit had always been to return to his parents' home when his seasonal employment ended and he intended to do so again in 1981. His relationship with Lucinda was, at least in his mind, no more permanent than his job. Under these circumstances, we hold he was a resident of his parents' household and, unless some policy exclusion is applicable he was covered under the policy. 699 S.W.2d at p. 159

The cited authority is not determinative of this appeal for a number of reasons, including the following:

(1) The absence from the parents' home was temporary and seasonal, whereas in the present case the deceased had estab-

lished a permanent residence in a house leased for a year.

(2) The Gatlinburg mail address was "General Delivery" whereas in the present case most of decedent's mail was addressed to the address of his leased home which appeared on his driver's license and checks.

(3) A partially dependent youth (19 years old) in the cited case testified as to the identity of his permanent home and his intention to return to it. In the present case, there was no testimony or other expression of the intent or attitude of deceased who was a 28 year old adult employed full time, except by his acts in leasing the house, using it as his personal and business headquarters and failure to accede to the urging of his father to "get out of the lease and come home".

(4) The policy in the cited case read, "resident of the same household", whereas the policy in the present case read "living with you".

(5) The cited authority states:

... Among the factors considered by the courts in deciding cases similar to this one are physical presence in or absence from the household, the circumstances of any absence, prior living arrangements, property left behind, maintenance of living quarters in the household, marital status, legal emancipation, and intent to return. See Annot. 93 A.L.R.3d 420 (1979). No single factor is controlling and the appellate courts usually afford great deference to the findings of the trial court. See e.g., *Aetna Cas. & Sur. Co. v. Means.* 382 F.2d 26 (10th Cir.1967); *Montgomery v. Hawkeye Security Ins. Co.,* supra [52 Mich.App. 457, 217 N.W.2d 449 (1974)], *American States Ins. Co. v. Walker,* 26 Utah 2d 161, 486 P.2d 1042 (1971). 699 S.W.2d at p. 158

Plaintiffs insist that deceased was living in two different homes simultaneously. It is stated:

He certainly resided in the rental house at 1714 Bartway. He was equally a resident of his parents' home.

This Court does not agree. The clear import of the evidence reviewed above is that deceased had established his headquarters at 1714 Bartway and that his presence at his parents' home was as a frequent and welcome visitor, and not a resident.

Plaintiffs next aver that deceased had expressed his intent to return to his parents' home on a full time basis. This is not the precise import of the evidence, which is quoted above. Deceased said, "yeah, I'm not going to move in" (meaning not going to move into the Bartway house), but he did. Mr. McDonough testified that deceased "was really serious about coming back with us ... he told me he did want to come back, but we didn't set any firm date". These quoted remarks do not establish the parents' home as his permanent place of residence to which he returned after temporary absences.

Plaintiffs next insist that the use of the Bartway house was transient in nature. The execution of a year's lease, the quantity and quality of furnishings and other circumstances enumerated above negative any transient nature of the Bartway residence.

In *Dreesler v. State Farm Mutual Automobile Insurance Company,* 52 Tenn.App. 514, 376 S.W.2d 700 (1963), the liability policy excluded injuries to a member of the family of the insured residing in the same household as the insured. The injured party and the insured lived in the same house which had been divided into three apartments. The insured lived in a large apartment. The injured party slept in a small apartment, but used the larger apartment for eating and socializing with the insured. This Court held that the injured party was a member of the family residing in the same household as the insured. It should be noted that, in the cited case, all activities of every kind on every day were carried out in the apartment of the insured except sleeping which took place in a separate apartment of the same house. In the present case, deceased did not do all of his eating or socializing in his parents' home, and was not there every day, or even most of the time.

Plaintiffs rely upon authorities holding that the burden of proving an exclusion is upon the insurer. This case does not involve an exclusion, but a condition, which is the burden of the insured.

In *Stoner v. State Farm Mutual Automobile Insurance Company*, 780 F.2d 1414 (8th Cir.1986), the policy contained the words, "lives with you", and the Court held that a 21 year old daughter stationed at a Naval Station in another state did not "live with" her parents.

Perhaps the nearest equivalent of the words "living with" would be "residing with" or "having residence with". Such words are not of precise legal definition. The word "reside" has been held in its ordinary sense and usage to mean to abide, to abide continuously, to sojourn, to lodge, to live in a place, to dwell, to dwell permanently for a length of time, to dwell permanently or for a considerable time, to dwell permanently for any length of time. 77 C.J.S. Reside, p. 287.

The word, dwell, includes the meanings of hesitate, delay, or continue in some state or condition. Webster's Third New International dictionary Unabridged p. 706.

The word "residence" has been defined as "a place where one dwells, where a person lives in settled abode, the place where a person lives with the intention of making it his home, and to which, whenever he is absent, he has the intention of returning. Residence is also defined to mean the principal domestic establishment of an individual, the place which he makes the chief seat of his affairs and interests." 77 C.J.S. Residence pp. 300, 301.

The place of residence of a person, or where that person lives is a matter of fact to be determined from his actions and intentions. It is possible for a person to have more than one principal place of abode so that it may be said that he has more than one principal residence, but this exceptional, and the necessary circumstances are not found in the present case.

The evidence shows clearly that he had selected and established his place of abode where he had a furnished bedroom, kitchen and living room, including bed, highboy, kitchen table and chairs, couch, hi-fi and TV, together with a room used as an office with desk, chair and filing case. The vehicle which he used personally was ordinarily parked at this place. Most of his mail came to this place. He had a telephone here and spent most of his nights here. He used this address on his checks and on his driver's license.

He also retained a special relationship with his former home, that of the plaintiffs. Some of his mail was delivered here. He visited here frequently, spending the night 2 or 3 nights per week, having free access to the house. A few of his possessions remained at the parents' home, including some clothes, furniture and odds and ends.

The relationship of deceased to his parents' home was that of a welcome, frequent, but irregular visitor. It could not be reasonably characterized as that of a resident who "lived with" his parents.

The finding of fact of the Trial Judge that deceased was not shown to be "living with" plaintiffs at the time of his injury must be presumed correct unless the evidence preponderates otherwise. T.R.A.P. Rule 13(d). The evidence does not preponderate otherwise. Therefore, the finding of the Trial Judge in this respect must be affirmed.

This finding does not in any way reflect upon or detract from the outstanding and praiseworthy devotion lavished upon deceased by plaintiffs. They did all that they could do to make their son a resident of their home, but, by his own decision, his situation was otherwise at the time of his fatal injury.

The first issue is found to be without merit.

Plaintiffs' second issue complains that the Trial Court found that deceased was not an additional assured under either policy. The sole ground of this complaint is that deceased was living with the insured at the time of his fatal injury. The disposition of the first issue, above, is conclusive of the second issue as stated.

Plaintiffs' third issue asserts that the insurer should be estopped from denying coverage based upon the fact that deceased was not living with insured at the time of his fatal injury.

In support of this issue, plaintiffs cite the following.

1. Bill Hayes, agent of insurer, was familiar with the children of plaintiff and the date of their births.

2. In August, 1984, Mr. Hayes stated to insured that deceased was covered by the umbrella policy. (In August, 1984, deceased was living with plaintiffs).

3. Plaintiffs were not well versed in insurance matters and depended upon Mr. Hayes for insurance information. He never told them that the insurer should be notified if one of the children moved out of the parental home.

4. On August 18, 1984, deceased applied for a boat insurance policy stating his "mailing address" to be the same as that of plaintiffs, and the application did not request the residence address of deceased.

5. Mr. Hayes and insured had done business together since 1978, had discussed the children of insured from time to time, but Mr. Hayes could not remember discussing the need to notify insurer when children removed from the parental home.

6. Prior to December 10, 1978, insurer carried a policy of insurance on a 1981 Plymouth. Paul McDonough was listed as the insured and deceased was listed as principal user. In July 1984, the vehicle was severely damaged and put out of use. The policy was "suspended" but not cancelled because it was anticipated that the policy would be applied to a replacement vehicle. On December 10, 1984, the policy was cancelled. At this time deceased was listed on the records of the insurer as the driver of a 1980 Chevrolet truck owned by insured, but no change in premium was charged. However, an increase in premium was scheduled to be placed in effect on April 19, 1985, when the policy was renewed. On March 16, 1985, there was a record of this anticipated change to be made on April 19, 1985.

Plaintiffs offer no argument as to why the foregoing facts should estop the insurer from denying uninsured motorist coverage for an injury unconnected with any insured vehicle at a time when deceased was not living with insured as required by the uninsured motorist provision of the policy or policies. This Court is equally unable to state a reason for estoppel under the circumstances.

The basic issue in this controversy is whether the policy condition of "living with you" was fulfilled. The only possible ground of estoppel would be that the insurer was under a duty to call attention to the provision of the policy, or to monitor the residence of each of the children of the insured so as to provide other protection for them in event of their removal from the parental home. This Court finds no such duty to call attention to policy provisions or to monitor residence. There is no evidence that the insurer had any notice that deceased had removed his place of residence away from the home of the insured.

Each issue presented by plaintiffs has been examined and found to be without merit. The judgment of the Trial Court is affirmed. Costs of this appeal are taxed against the plaintiffs. The cause is remanded to the Trial Court for such further proceedings, if any, as may be necessary and proper.

Affirmed and remanded.

CANTRELL and KOCH, JJ., concur.